# United States Court of Appeals
# for the Federal Circuit

———————————

**SYSTEMS APPLICATION & TECHNOLOGIES, INC.,**
*Plaintiff-Appellee,*

**v.**

**UNITED STATES,**
*Defendant-Appellant,*

**and**

**MADISON RESEARCH CORPORATION,**
*Defendant.*

———————————

2012-5004

———————————

Appeal from the United States Court of Federal Claims in Case No. 11-CV-280, Judge Margaret M. Sweeney.

———————————

Decided: August 24, 2012

———————————

CRAIG A. HOLMAN, Arnold & Porter LLP, of Washington, DC argued for plaintiff-appellee. With him on the brief were KARA L. DANIELS and EMMA V. BROOMFIELD.

FRANKLIN E. WHITE, JR., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for

defendant-appellant. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and MATTHEW F. SCARLATO, Trail Attorney.

————————————

Before RADER, *Chief Judge*, O'MALLEY and WALLACH, *Circuit Judges*.

RADER, *Chief Judge*.

In this bid protest action, the United States Court of Federal Claims denied the U.S. Army's motion to dismiss the complaint filed by Systems Application & Technologies, Inc. ("SA-TECH"). SA-TECH, the original contract awardee for aerial target flight and maintenance services, protested the Army's decision to engage in corrective action instead of allowing SA-TECH's award to stand. In addition to asserting subject matter jurisdiction, the Court of Federal Claims also found the Army's actions to be unreasonable and contrary to law. *Sys. Application & Techs., Inc. v. United States*, 100 Fed. Cl. 687, 702–710 (2011). Upon review of the record, this court affirms.

## I.

The Court of Federal Claims admirably stated the relevant facts in its opinion. *Id.* at 693–702. With that in mind, this court only sets forth the facts required to assess the Army's jurisdictional arguments.

In April 2010, the Army solicited proposals for the provision of aerial target flight operations and maintenance services at numerous Army installations. The solicitation proposed a contract with one base year and four option years. At the time of the solicitation, Kratos Defense & Security Solutions ("Kratos") provided these services under a predecessor contract. *Id.* at 694.

The solicitation listed three evaluation factors: Technical/Management; Past Performance; and Price/Cost. The solicitation indicated that the Army would rate Technical/Management and Past Performance factors and sub-factors as "outstanding," "satisfactory," "marginal," or "unsatisfactory." *Id.* Overall, the Technical/Management and Price/Cost factors were similarly weighted, and, "taken individually, were 'significantly more important' than the Past Performance factor." *Id.* However, the Technical/Management and Past Performance factors, when considered together, were "more important" than the Price/Cost factor. *Id.*

The Technical evaluation factor had three sub-factors, including Labor. The Labor sub-factor required "[e]vidence of the availability of sufficient personnel with the required skills, experience, and of the proposed labor mix to assure effective and efficient performance." J.A. 10270. The solicitation required offerors to provide "[t]he labor mix (i.e. job categories and hours assumed for each) for the SOW [Statement of Work] as a whole," "[m]inimum and proposed levels of education," "resumes for each individual proposed" for specific labor categories, and "the total number of personnel proposed to perform the requirements of the SOW." J.A. 10267.

The solicitation provided that the contract would be subject to the Service Contract Act of 1965. For such contracts, the Federal Acquisition Regulation ("FAR") requires that "successor contractors performing on contracts in excess of $2,500 for substantially the same services performed in the same locality must pay wages and fringe benefits (including accrued wages and benefits and prospective increases) **at least equal to those contained in any bona fide collective bargaining agreement entered into under the predecessor contract**." FAR 22.1002-3(a) (emphasis added). The

Army later amended the solicitation to include an updated Wage Determination. The new Wage Determination contained the collective bargaining agreement between the incumbent Kratos and the International Association of Machinists and Aerospace Local Lodge 2515.

The Army received three proposals, including the offers from SA-TECH and Kratos. The Army's Technical Evaluation Committee initially evaluated the proposals and included all three in the competitive range. *Sys. Application & Techs.*, 100 Fed. Cl. at 696. Following a period of discussions, the Army requested final proposal revisions from the offerors. *Id.*

After a review, the Technical Evaluation Committee announced its findings in a Final Evaluation Report. While it noted potential difficulties for SA-TECH under the Labor sub-factor, it rated SA-TECH as "outstanding" for all evaluation factors. *Id.* at 697. Kratos also received "outstanding" ratings. *Id.*

The Source Selection Authority reviewed the evaluations and concluded that SA-TECH offered the best value for the government. Because "there were no meaningful distinctions between the non-cost portions of the proposals . . . ," the Source Selection Authority found the "price/cost advantages of SA-TECH's proposal" tilted the balance in its favor. *Id.* at 698. The Army notified the offerors of its award decision. The notification letters disclosed SA-TECH's final price and the adjectival ratings for all offerors' proposals. *Id.*

Kratos filed a protest with the Government Accountability Office ("GAO"). Kratos argued the Army improperly added a new requirement to the solicitation when it issued the updated Wage Determination. Kratos also asserted that the Army's evaluation of labor mixes did not

consider the offerors' compliance with the collective bargaining agreement. Finally the protest challenged SA-TECH's Technical/Management rating. *Id.* SA-TECH intervened in the protest. Several months later, Kratos filed a supplemental protest with the GAO. It claimed the Army's "systematic process of assigning an 'Outstanding' rating to every Factor for each bidder, regardless of the evaluator's comments and plain language of the proposals," converted the best value procurement into a lower-price, technically acceptable evaluation. *Id.* at 700. Kratos highlighted the fact that the Technical Evaluation Committee assigned an "outstanding" rating to SA-TECH's proposal under the Labor sub-factor in spite of its concerns with SA-TECH's proposal on this point. *Id.*

Upon receipt of Kratos' supplemental protest, the GAO attorney informed the parties that he intended "to suggest . . . that, on the face of it, the protester offer[ed] a straight forward argument as to why the agency's evaluation of the technical portions of the proposals was unreasonable." *Id.* He asked whether "the agency [was] more inclined to continue to defend the protest or take corrective action." *Id.*

SA-TECH responded to Kratos' supplemental protest. *Id.* It requested the GAO dismiss Kratos' supplemental protest because it was untimely and speculative. Moreover, SA-TECH noted that Kratos was not next in line for the contract award. Therefore, SA-TECH questioned Kratos' showing of prejudice. *Id.*

The GAO attorney again notified the parties of his view that Kratos' supplemental protest had merit. He expressed his view of the technical evaluation as well the agency's treatment of SA-TECH's purported weaknesses and concluded that the GAO would "likely sustain this

protest . . . ." J.A. 11995. The GAO invited further comments, but only from the Army.

On April 22, 2011, the Army sent a letter to the GAO, Kratos, and SA-TECH which stated:

> After review of the supplemental issues, **the Army has determined that it is in its best interest to take corrective action**. The Army intends to terminate the contract awarded to SA-TECH so that it can reopen the original solicitation. **The solicitation will then be amended** to explain the intention of providing Kratos' [collective bargaining agreement] in the solicitation.

*Sys. Application & Techs.*, 100 Fed. Cl. at 702 (emphasis added). The Army also stated it would give offerors the opportunity to submit revised proposals and reserved the right to conduct further discussions. *Id.* The Army's letter concluded: "The Army believes that this corrective action makes the pending protest moot and no further purpose would be served by the GAO's review of the protest. Therefore, the Army requests that the GAO dismiss Kratos' protest." J.A. 11997. On April 25, 2011, the GAO dismissed Kratos' protest and stated: "the agency's decision to terminate the contract award and reopen the solicitation renders the protest academic." J.A. 11998.

SA-TECH filed a protest at the Court of Federal Claims that challenged the Army's decision to engage in corrective action. SA-TECH alleged the Army's decision was arbitrary, capricious, and unreasonable because it was based on an improper and unreasonable GAO statement. *Sys. Application & Techs.*, 100 Fed. Cl. at 702. It also claimed the Army's decision to engage in corrective action independently lacked a rational basis and involved a violation of law, regulation, or procedure. *Id.* SA-TECH

also took issue with the Army's decision to amend the solicitation. Kratos intervened. At the proper time, SA-TECH filed a motion for judgment on the administrative record. The Army and Kratos moved to dismiss the complaint for lack of subject matter jurisdiction and cross-moved for judgment on the administrative record.

The Court of Federal Claims denied the motions to dismiss, finding jurisdiction under 28 U.S.C. § 1491(b)(1). *Id.* at 703–10. The trial court also found that SA-TECH showed proper standing and ripeness. *Id.* On the merits, the Court of Federal Claims found the Army's decision to take corrective action was arbitrary, capricious, and an abuse of discretion. *Id.* at 719. The trial court also granted SA-TECH's request for injunctive relief, which prohibited the Army from implementing the proposed corrective action. *Id.* at 722.

The Army timely appealed to this court. The Army's appeal is limited to the questions of jurisdiction and justiciability; it does not challenge the Court of Federal Claims' merits decision. This court has jurisdiction under 28 U.S.C. § 1295(a)(3).

## II.

This court reviews the Court of Federal Claims' decision on the legal question of subject matter jurisdiction without deference. *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1242 (Fed. Cir. 2010). Courts have limited jurisdiction to hear and decide suits against the United States due to principles of sovereign immunity. Sovereign immunity protects the government from suit except for instances in which the immunity has been unequivocally and expressly waived. *United States v. King*, 395 U.S. 1, 4 (1969).

In this case, the Tucker Act expressly waives sovereign immunity for claims against the United States in bid protests. Accordingly, the Court of Federal Claims

> shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement . . . without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1) (2006). The Court of Federal Claims correctly observed this waiver covers a broad range of potential disputes arising during the course of the procurement process. On its face, the statute grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement. *Sys. Application & Techs.*, 100 Fed. Cl. at 704.

While the Army understandably wishes to narrow the scope of the Tucker Act's grant of jurisdiction, a narrow application of section 1491(b)(1) does not comport with the statute's broad grant of jurisdiction over objections to the procurement process. In *Resource Conservation Group, LLC v. United States*, this court considered the legislative history of the Tucker Act and its amendments. 597 F.3d at 1244–45. This court rejected the argument that section 1491(b)(1) grants the Court of Federal Claims protest jurisdiction over non-procurement disputes (such as a dispute over a lease of government property). *Id.* In so doing, this court clarified that once a party objects to a

procurement, section 1491(b)(1) provides a broad grant of jurisdiction because "[p]rocurement includes *all stages of the process of acquiring property or services*, beginning with the process for determining a need for property or services and ending with contract completion and close-out." *Id.* at 1244 (emphasis added) (quoting 41 U.S.C. § 403(2)); *see also Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008) (concluding that the statutory definition for procurement found in 41 U.S.C. § 403(2) should be utilized in determining the scope of section 1491(b)(1)).

In this case, SA-TECH objected to a solicitation and alleged violations of statutes and regulations governing the procurement process. The Army has not shown that this protest has no "connection with a procurement." Rather SA-TECH's complaint specifically challenged the Army's announced decision to amend or revise the solicitation – an unambiguous objection "to a solicitation" covered by the Tucker Act. SA-TECH also alleged violations of the Service Contract Act and procurement regulations – another basis for jurisdiction. *Distributed Solutions, Inc.*, 539 F.3d at 1345 n.1 (noting a protestor need only make a "non-frivolous allegation of a statutory or regulatory violation in connection with a procurement or proposed procurement" in order to meet this jurisdictional requirement). The Court of Federal Claims' decision on the merits underscores that SA-TECH's allegations of procurement violations were not frivolous. *Sys. Application & Techs.*, 100 Fed. Cl. at 719.

In this case, the Army had not yet implemented the corrective action. Moreover, SA-TECH was the contract awardee. Neither of these facts are material to the question of jurisdiction. This court has made clear that bid protest jurisdiction arises when an agency decides to take corrective action even when such action is not fully im-

plemented. *See, e.g., Turner Constr. Co. v. United States*, 645 F.3d 1377 (Fed. Cir. 2009) (finding no jurisdictional bar for a bid protest brought by a contract awardee after the Army terminated the awardee's contract and announced its decision to follow the GAO's recommendation to re-compete a contract); *Centech Grp., Inc. v. United States*, 554 F.3d 1029 (Fed. Cir. 2008) (affirming the Court of Federal Claims' merits decision in a bid protest brought by the previous contract awardee before corrective action was completed); *ManTech Telecomms. & Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57 (2001), *aff'd per curiam*, 30 F. App'x 995 (Fed. Cir. 2002).

SA-TECH's attempt to enjoin the government from terminating its contract did not transform its otherwise proper protest under the Tucker Act into a claim which could only be adjudicated under the Contract Disputes Act and its concomitant procedural requirements. This court confronted and rejected a similar argument in *Turner Construction*, 645 F.3d at 1387–88. A request for injunctive relief regarding the government's termination of a contract concerns the scope of the Court of Federal Claims' equitable powers; it is not an issue of Tucker Act jurisdiction. *Id.* at 1388. Thus, the Court of Federal Claims properly exercised its jurisdiction under the Tucker Act as SA-TECH both objected to a solicitation and alleged violation of statute or regulation in connection with a procurement.

## III.

The Court of Federal Claims also correctly determined that SA-TECH has standing to bring its protest. Traditional standing analysis invokes the "case or controversy" requirement of Article III of the Constitution. *Camreta v. Greene*, 131 S. Ct. 2020, 2028 (2011). However, standing in bid protests is framed by 28 U.S.C. § 1491(b)(1), which

requires that bid protests be brought by "interested parties." 28 U.S.C. § 1491(b)(1). The "interested party" standard is more stringent than the requirements of Article III. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009). SA-TECH must establish that it "(1) is an actual or prospective bidder; and (2) possess[es] the requisite direct economic interest." *Id.* (internal citations omitted).

A protest will, by its nature, dictate the necessary factors for a "direct economic interest." In pre-award protests, for instance, the plaintiff must show "a non-trivial competitive injury which can be addressed by judicial relief." *Id.* at 1362. In post-award protests, the plaintiff must show it had a "substantial chance" of receiving the contract. *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006); *see also Weeks Marine Inc.*, 575 F.3d at 1361–62 (rejecting the proposition that the "substantial chance" requirement applies outside of the post-award context). SA-TECH lodges a pre-award protest against the Army's decision to resolicit proposals. *See Outdoor Venture Corp. v. United States*, 100 Fed. Cl. 146, 153 (2011) (collecting cases). The Army does not dispute that SA-TECH is an actual or prospective bidder. Thus, SA-TECH's standing hinges upon whether the Army's decision gives rise to a "non-trivial competitive injury which can be addressed by judicial relief."

This court determines that this protest asserts the necessary injury for standing. First, the Army's decision to engage in corrective action will arbitrarily require SA-TECH to win the same award twice. *See CBY Design Builders v. United States*, No. 11-740C, --- Fed. Cl. ----, 2012 WL 1889299, *32 (Fed. Cl. May 11, 2012) ("[A]rbitrarily being required to win the same award twice . . . is certainly the sort of non-trivial competitive injury sufficient to support [a protestor's] standing to object to

the corrective action."). Obtaining a contract award, whether through sealed bidding or a negotiated process, is often a painstaking (and expensive) process. An arbitrary decision to take corrective action without adequate justification forces a winning contractor to participate in the process a second time and constitutes a competitive injury to that contractor. *Cf. United States v. John C. Grimberg Co.*, 702 F.3d 1362, 1367 (Fed. Cir. 1983) (en banc) (noting that there is an implied contract that the procurement process will be conducted fairly and honestly); *Joseph L. DeClerk & Assocs., Inc. v. United States*, 26 Cl. Ct. 35, 46-47 (1992) (noting that the procurement process should be a level playing field and contractors should be treated evenly and fairly); *Hosp. Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005) (noting that the lost opportunity to compete for a contract on a level playing field is an irreparable harm for the purposes of injunctive relief).

Just as important, the Army's decision to engage in corrective action will require SA-TECH to re-compete for a contract after its price had been made public. Unquestionably an offeror's participation in the procurement process involves some acceptance of risk. *See* Steven Schooner, *Fear of Oversight: The Fundamental Failure of Businesslike Government*, 50 Am. U. L. Rev. 627, 695 (2002) (discussing risk allocation as a fundamental characteristic of government contracting). The risk of re-competing for a contract after revelation of one's price calculations to competitors, however, does not extend to a contract fairly competed and won on the first solicitation.

In this case, with price a pivotal term of the process, SA-TECH would unduly bear the burden of re-competing with its prices alone on the table. Price was a crucial factor in making the original contract award. Once the contracting officer eliminated meaningful distinctions

between the non-cost portions of the various proposals, SA-TECH's lowest offer tipped the scales in its favor. In this case, the Army has not appealed the finding that its actions were arbitrary. Therefore, the Army without adequate justification -- indeed, with arbitrariness -- forces SA-TECH to re-compete for the contract. In that posture, SA-TECH will no longer have the pivotal competitive advantage from the initial solicitation. The publication of its price alone places SA-TECH in the unenviable position of competing against itself. *See Bayfirst Solutions, LLC v. United States*, No. 12-131C, --- Fed. Cl. ----, 2012 WL 1513007, at *5 (Fed. Cl. April 30, 2012) (finding that a protestor shows sufficient competitive injury if it loses a competitive advantage through the government's decision to resolicit proposals). Based on these facts, the Court of Federal Claims correctly determined that SA-TECH showed a non-trivial competitive injury and thus had standing under 28 U.S.C. § 1491(b)(1) as an interested party.

IV.

Finally, the Court of Federal Claims correctly found that SA-TECH presented a claim ripe for judicial review. A claim is not ripe for judicial review when it is contingent upon future events that may or may not occur. *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985). The purpose of the doctrine is to prevent the courts, "through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). In assessing ripeness, there are two basic factors: "(1) the

fitness of the issues for judicial decision[;] and (2) the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149.

When a party challenges government action, the first factor becomes a question of whether the challenged conduct constitutes a final agency action. *See Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1363 (Fed. Cir. 2008); *U.S. Ass'n of Imps. of Textiles & Apparel v. U.S. Dep't of Commerce*, 413 F.3d 1344, 1349–50 (Fed. Cir. 2005). Final agency action hinges on two points: "First, the action must mark the 'consummation' of the agency's decision-making process – it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).

The Army asserts that SA-TECH has not challenged a final agency action. SA-TECH challenged "the Army's announcement of its intention to take corrective action – before any such action was taken." Appellant's Brief 20. According to the Army, its statements to the GAO, SA-TECH, and Kratos that it intended to engage in corrective action were not binding and "nothing prohibited the Army from abandoning its proposed course of action and allowing SA-TECH's award to stand . . . ." *Id.* at 21. In its view, the decision to take corrective action will not be fully consummated unless and until the Army re-awards the contract to an offeror other than SA-TECH. *Id.*

This court finds no merit in the Army's argument. The Army memorialized its decision to take corrective action in a letter to the GAO and the parties, stating: "the Army **has determined** that it is in its best interest to take corrective action." J.A. 11996 (emphasis added). As

the Court of Federal Claims noted, there was nothing interlocutory, uncertain, or tentative about this declaration. *Sys. Application & Techs.*, 100 Fed. Cl. at 709. Not only did the Army declare its decision to engage in corrective action, but it set in motion several irretrievable legal consequences. For instance, the Army's letter to the GAO stated: "The Army believes that this corrective action makes the pending protest moot and no further purpose would be served by the GAO's review of the protest. Therefore, the Army requests that the GAO dismiss Kratos' protest." J.A. 11997. Accordingly, the GAO dismissed Kratos' protest, changing the legal landscape for both SA-TECH and Kratos.

The Army represented that its decision to engage in corrective action was sufficiently final to moot Kratos' GAO bid protest. The Army may not now claim that the decision is not final until the re-award of a contract. Orderly procedure cannot tolerate such contradictory positions. The government cannot manipulate the finality doctrine to suit its own current litigation strategies.

Furthermore, the Army's proposed finality rule would make some of their actions protest-proof. Part of the proposed corrective action is to amend the terms of the solicitation "to explain the intention of providing Kratos' [collective bargaining agreement] in the solicitation." J.A. 11996–97. However, the Army states that its action would be final when "the new contract award decision is made." Appellant's Brief 26. If SA-TECH's claims were not ripe until after the contract award, then SA-TECH could never protest this proposed amendment to the terms of the solicitation. *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) (holding that a party who fails to object to the terms of a solicitation "prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid

protest action in the Court of Federal Claims"). As noted in *Weeks Marine*, such an absurd result cannot stand. *Weeks Marine, Inc.*, 575 F.3d at 1362–1363. Thus, the Army's decision to engage in corrective action is sufficiently final.

This court's precedent in *Tokyo Kikai Seisakusho, Ltd. v. United States* does not compel a different result. In *Tokyo Kikai Seisakusho*, this court addressed ripeness in the narrow context of the Department of Commerce's review of its own sunset rulings in antidumping cases. 529 F.3d at 1363–64. This case arises from a very different context: government procurement. Additionally, in *Tokyo Kikai Seisakusho*, the agency's non-final decision was announced as part of its role as a neutral arbiter in trade disputes. *Id.* Here, the Army announced its decision as an interested party in a litigation dispute and the GAO, a quasi-judicial body, acted on the veracity of the Army's statements.

With respect to the hardship element of the ripeness analysis, the Army asserts that SA-TECH has not suffered a hardship because the "announced intention to implement corrective action is an intermediate step of a single procurement process, and the continuation of that process, while SA-TECH remains in contention, is not a hardship." Appellant's Br. 26. As discussed above, this approach ignores the competitive hardships SA-TECH suffers as a result of the Army's arbitrary decision to re-compete the contract.

Although SA-TECH will have a remedy under the Contract Disputes Act if its contract is terminated, the possibility of this termination is still a hardship under the ripeness analysis. Unlike the standard for obtaining injunctive relief, which requires a showing of irreparable harm, the standard for ripeness requires a lesser showing

of hardship. *See Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, 1295 (Fed. Cir. 2008) (citing *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167 (1976) ("Withholding court consideration of an action causes hardship to the plaintiff where the complained-of conduct has an 'immediate and substantial impact' on the plaintiff."). SA-TECH made a showing of immediate and substantial impact in this case.

## V.

The Court of Federal Claims correctly exercised its jurisdiction and properly found SA-TECH's claims justiciable. SA-TECH's protest met the requirements of the Tucker Act and met the standards for ripeness and standing.

## AFFIRMED