# In the United States Court of Federal Claims

No. 13-246C

(Filed Under Seal: June 27, 2013)
(Reissued: July 2, 2013)

|  |  |  |
|---|---|---|
| | ) | |
| **MVS USA, INC.,** | ) | Post-award protest of a procurement |
| | ) | award by the Defense Information |
| **Plaintiff,** | ) | Systems Agency for satellite |
| | ) | communications services; alleged |
| **v.** | ) | unequal treatment of offerors; FAR |
| | ) | 8.405-2(c)(3)(iii)(C); standing |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **NORTHROP GRUMMAN SYSTEMS CORP.,** | ) | |
| | ) | |
| **Defendant-Intervenor.** | ) | |
| | ) | |

J. Randolph MacPherson, Halloran & Sage LLP, Washington, D.C., for plaintiff. With him on the briefs was Rebecca Bailey Jacobsen, Halloran & Sage LLP, Washington, D.C.

Domenique Kirchner, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Kirk T. Manhardt, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., and Joann W. Melesky, Chief Legal Counsel, Defense Information Systems Agency/Defense Information Technology Contracting Organization, Scott AFB, Illinois.

Jonathan J. Frankel, Steese, Evans & Frankel, P.C., Washington, D.C. for defendant-intervenor. With him on the briefs were John P. Janecek and Steven D. Tibbets, Steese, Evans & Frankel, P.C., Washington, D.C.

## OPINION AND ORDER[1]

---

[1]Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The

LETTOW, Judge.

This post-award bid protest concerns a contract for satellite communications services to be provided to the Defense Information Systems Agency ("DISA"). Pending before the court are the government's motion to dismiss or, in the alternative, motion for judgment on the administrative record, a corresponding motion to dismiss or, in the alternative, motion for judgment on the administrative record by defendant-intervenor Northrop Grumman Systems Corp. ("Northrop Grumman"), the contract awardee, and plaintiff's motion for judgment on the administrative record. Plaintiff, MVS USA, Inc. ("MVS"), contends that the General Services Administration ("GSA"), in concert with DISA, did not fairly consider its quotation for the award of a task order for supply of a spectrum of satellite communication services to support the Joint Battle Command-Platform Blue Force Tracking. *See* Mem. in Support of Pl.'s Mot. for Judgment on the Admin. Record, and Opp'n to Mots. to Dismiss ("Pl.'s Mem.") at 1-2, ECF No. 60; *see also* AR 10-291 to 538 (Request for Quote ("RFQ")) (Nov. 15, 2012).[2] Competing for the task order were certain holders of Federal Supply Schedule 70 master contracts with GSA, of which MVS was one. Of significance to this case is an amendment to the RFQ for the task order, requiring a facility clearance at the level of secret at the time of the award. AR 12-546 (Amendment 2 to RFQ). MVS alleges that GSA, acting as the lead agency for the security-clearance aspect of the procurement pursuant to an agreement with DISA, did not fairly consider MVS's application for a clearance attendant to its proposal because GSA did not endeavor to process MVS's application before the award of the task order. *See* Pl.'s Mem. at 2. Secondarily, MVS alleges that Northrop Grumman, the actual awardee and defendant-intervenor, made material representations in its quote that should have disqualified Northrop Grumman from participating in the procurement at issue. *Id.* at 2-3.

---

parties were requested to review this decision and to provide proposed redactions of any confidential or proprietary information. The resulting redactions are shown by asterisks enclosed by brackets, *e.g.*, "[***]."

After the opinion was filed under seal, plaintiff filed a Motion to Alter or Amend Opinion and Order. *See* ECF No. 102 (June 27, 2013). The court has granted this motion, and this reissued opinion reflects modifications to a factual aspect of the decision and a grant of plaintiff's motion further to supplement the administrative record, which motion was embedded in plaintiff's motion to alter or amend the opinion and order.

[2]"AR ____" refers to the administrative record filed with the court in accord with RCFC 52.1(a). The administrative record has been subdivided into tabs. The first number in a citation to the administrative record refers to a particular tab, and the number after the hyphen refers to the particular page of the administrative record, *e.g.,* "AR 6-28." The pages of the administrative record are paginated sequentially without regard to the tabs.

## FACTS[3]

The RFQ at issue, CSS0025.00, called for quotes from eligible offerors for a task order that would supply a spectrum of satellite communication services to support the Joint Battle Command-Platform Blue Force Tracking under the Future Commercial Satellite Communications Services Acquisition ("FCSA") Program. AR 10-291 (RFQ); *see also* AR 51-3223 to -30 (Response to Agency Level Protest of MVS (Mar. 19, 2013)). The FCSA Program is based on a partnership between GSA and DISA. *See* Mem. of Agreement Between DISA and GSA for FCSA (signed July 6, 2009 and July 28, 2009) ("MOA"), ECF No. 79; AR 51-3223.[4] By the MOA, the agencies agreed to a "reciprocal cooperation" arrangement that would streamline the acquisition of commercial satellite services. MOA at 1. GSA is responsible for awarding Federal Supply Schedule ("FSS") IT Schedule 70 contracts to qualified providers, and it created two new special item numbers ("SINs"), 132-54 and 132-55, under Schedule 70 that were focused on provision of satellite communications services. *Id.* at 3. Vendors on these SINs

---

[3]The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement and the parties' evidentiary submissions. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (noting that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court").

[4]To perform a review of an agency's action in a procurement, the court must have the complete record that was before the agency at the time it made its decision. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated in part by Califano v. Sanders*, 430 U.S. 99 (1977) (abrogating *Overton Park* to the extent it recognized the APA as an independent grant of subject matter jurisdiction); *see also MG Altus Apache Co. v. United States*, 102 Fed. Cl. 744, 750 (2012). In instances where the agency's documentary record does not encompass information that was before the agency at the time of its decision and the omission precludes effective judicial review, a court may allow the parties to supplement and thus complete the administrative record. *Axiom Res. Mgmt. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009).

The administrative record submitted by the government has evolved over the brief, accelerated progression of this case. Among other things, the government has filed three separate additive corrections to the administrative record as originally filed. It has also submitted a number of declarations, several of which were provided to serve a gap-filling function. Additionally, the government provided the MOA after completion of briefing, ostensibly to address questions that had arisen in the briefing on the dispositive motions. The government nonetheless contests consideration of the MOA as a part of the administrative record, *see* Def.'s Notice at 1 ("In [the government's] view, the MOA is not relevant to the [c]ourt's resolution of this matter, and is not part of the administrative record at issue in this case."), even though the MOA delineates the relative roles of GSA and DISA in consideration of competitive task orders under the FCSA Program. Because the MOA is directly relevant to GSA's and DISA's actions in the procurement at issue and the MOA is not a publicly available document, it properly constitutes part of the administrative record and the government's objections to its inclusion are overruled. *See Midwest Tube Fabricators, Inc. v. United States*, 104 Fed. Cl. 568, 573 (2012); *MG Altus*, 102 Fed. Cl. at 750 (quoting *L-3 Commc'ns Integrated Sys.*, *L.P. v. United States*, 91 Fed. Cl. 347, 354 (2010)).

can compete for task orders related to the provision of satellite communications services, including task orders managed by DISA. *Id.* at 4. For those task orders, DISA serves as the ordering agency, *id.* at 4, 6, meaning that it prepares and issues the RFQ, evaluates quotes, and makes an award.

The new partnership was discussed with potential vendors of satellite communications services at industry days held in October 2009 and April 2010. *See* AR 1-1 to 44 (2009 Industry Day PowerPoint Slides); AR 2-45 to 83 (2010 Industry Day PowerPoint Slides). At these industry days, potential vendors were advised that DISA "intend[ed] to award a significant number of task orders using Schedule 70 SINs 132-54 and 132-55." AR 2-75. The government noted that "[s]ome of these task orders require facilities and personnel clearances, which require completing the Department of Defense Contract Security Classification Specification DD 254 process." *Id.*; *see also* AR 1-27.[5]

MVS was awarded a Schedule 70 contract in January 2011. *See* AR 4-215 (MVS Schedule 70 Contract). No facility clearance was needed to obtain a Schedule 70 contract, and MVS did not have one. *See* Def.'s Mot. to Dismiss or, in the Alternative, Mot. for Judgment on Admin. Record ("Def.'s Mot.") at 22-23, ECF No. 45.[6] With the award of a Schedule 70 contract, MVS became eligible to compete for task orders issued under the SINs for provision of commercial satellite services, and, in February 2012, it received an order; that order, however, was quickly terminated for convenience. *See* Decl. of Karen Stewart, Project Manager for Government Services at MVS ("Stewart Decl."), ECF No. 58-3, Tab 6, ECF No. 58-4 (Contract No. HC 1013-12-F-0010 (Feb. 14, 2012)); *see also* Hr'g Tr. 23:1-8.[7] For that order, security

---

[5]A facility clearance is "an administrative determination that a company is eligible for access to classified information or award of a classified contract. . . . A contractor or prospective contractor cannot apply for its own [facility clearance.] A [government contracting authority] or a currently cleared contractor may sponsor an uncleared company for [a facility clearance]." AR 65-3559 (National Industrial Security Program Operating Manual).

[6]ViaSat is the current provider of the satellite communications services in question and operates with a facility clearance. Hr'g Tr. 9:15-20 (June 12, 2013). MVS serves as a subcontractor to ViaSat under that contract, and did not have a facility clearance. *See* Hr'g Tr. 9:21-24.
Additional references to the transcript of the hearing held on June 12, 2013, will omit the date.

[7]The Stewart declaration and attachments describe the facility clearance requirement for RFQ CSS0013, which was the predecessor contract to the RFQ at issue and was awarded to MVS in February 2012. Def.'s Mot. at 8-9. MVS did not then have a facility clearance. The CSS0013 contract was terminated for convenience shortly after award, and the needed services were then resolicited in the CSS0025.00 RFQ. *Id.* Accordingly, the Stewart declarations serve a gap-filling role and appropriately supplement the administrative record. *See supra*, n.4; *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1339 (Fed. Cir. 2001) (stating that although remand is usually the preferred course to fill gaps in an agency administrative record, in government procurement cases, it may be appropriate to use

4

clearances were not required at the time of award, although the government noted that it would "issue an appropriate DD254" if a need arose during the course of the contract. *See* Stewart Decl., Tab 5 at 22 (RFQ for CSS0013.00 (Nov. 28, 2011)). Because of the termination of that award, no such need arose.

On November 13, 2012, Anne Miller, a GSA contract specialist responsible for MVS's Schedule 70 contract, wrote to MVS to ask whether MVS intended to submit a DD Form 254 to obtain a security clearance. AR 8-251 (E-mail from Anne Miller to Karen Stewart and Tim Bracken). The e-mail indicated that a security clearance could be acquired in connection with MVS's Schedule 70 contract and would appear as a modification to that contract. *Id.* at 251 to -52. That same day, MVS responded to Ms. Miller with questions about the application process, and it also informed her that it had twice submitted a DD Form 254 to DISA as part of prior bid packages. AR 8-257 to -58 (E-mail from Karen Stewart to Anne Miller and Tim Bracken). Ms. Miller forwarded MVS's questions to Donald Carlson, the FCSA Program Security Manager at GSA, who replied to MVS on November 14, 2012. AR 9-261 (E-mail from Donald Carlson to Karen Stewart and Anne Miller).

On November 15, 2012, DISA issued the RFQ at issue, which requested quotes for the supply of satellite communications services to support the Joint Battle Command-Platform Blue Force Tracking. AR 10-291 (RFQ). The quotes were due by December 14, 2012, and the contract was to be awarded by February 1, 2013. *See id.* Vendors were required to have a current Schedule 70 contract in place. *Id.* at 291 to -92. The Performance Work Statement advised that [t]he work performed for this task order will be at the SECRET level. During the course of the contract, there may be requirements for the contractor to support the [g]overnment

---

declarations or depositions as remand is "unduly cumbersome"); *Vanguard Recovery Assistance, J.V. v. United States*, 99 Fed. Cl. 81, 101 (2011) (holding that admitting extra-record evidence rather than remanding in gap-filling situations serves "the need for expeditious resolution of the action").

The government has also submitted three declarations to supplement the record regarding its processing of MVS's facility clearance application. The government's proffered declarations are from Donald Carlson, the FCSA Program Security Manager at GSA, Vanessa McCollum, the DISA/DITCO contracting officer who dealt with the RFQ at issue, and Justin Walsh, chief of the Facilities Clearance Branch of DSS. *See* Def.'s Mot. to Supplement the Admin. Record, (May 10, 2012), ECF No. 44; Def.'s Second Mot. to Supplement the Admin. Record, (May 31, 2013), ECF No. 68. MVS has submitted additional declarations from Deborah Deffaa, MVS's Chief Executive Officer, Brian Aziz, MVS's Director of Government Services, and Karen Stewart, a project manager for Government Services at MVS. *See* Pl.'s Mot. to Complete and Supplement the Admin. Record, (May 24, 2013), ECF No. 58. Each of these declarations are admitted to supplement the administrative record because they fill a gap which otherwise would exist. Post hoc rationalizations and statements in the declarations will be critically examined, as the law requires. *See Vanguard*, 99 Fed. Cl. at 102-03; *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 204 (2004) (citing *Citizens to Pres. Overton Park*, 401 U.S. at 420; *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519 (1978); and *Co-Steel Raritan, Inc. v. International Trade Comm'n*, 357 F.3d 1294, 1316 (Fed. Cir. 2004)), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004).

in a classified environment. The U.S. Government will issue an appropriate DD254 Department of Defense Contract Security Classification Specification as required. Offerors must have a minimum facility/COMSEC clearance level of Secret.

*Id.* at 319. Two weeks later, on December 2, 2012, DISA issued an amendment ("Amendment 2") to the RFQ in response to vendor questions about when an offeror would need to obtain a facility security clearance. The amendment stated that "[a] Secret facility clearance [was] required prior to award" of the task order. AR 12-546 (Amendment 2). On December 6, 2012, several days after this amendment was issued, MVS submitted a completed DD Form 254 to Ms. Miller at GSA, who forwarded the application to Mr. Carlson, the FCSA Program Security Manager. *See* AR 16-774 (E-mail from Tim Bracken to Anne Miller); AR 17-777 (E-mail from Anne Miller to Donald Carlson).

Three offerors, including MVS and Northrop Grumman, submitted quotations to DISA on December 17, 2012. *See* AR 45-3168 to -69 (DISA Final Evaluation-Selection Recommendation Document). With its quote, MVS submitted a second DD Form 254 to DISA, as it had done for past RFQs. AR 25-861 to -62 (MVS's Second DD Form 254). DISA then proceeded to open exchanges with the offerors using evaluation notices. *See* AR 30-1552 (MVS Exchanges Letter); AR 31-1685 (Northrop Grumman Exchanges Letter). The evaluation notices sent to MVS did not raise questions regarding MVS's submission of a DD Form 254 or its possession of a facility clearance.[8] About six weeks later, on February 1, 2013, DISA issued letters to the three offerors requiring final quotation revisions, along with proof of facility clearance, to be submitted by February 4, 2013. *See* AR 32-1788 to -89 (Final Quotation Revision Request to MVS).

On February 1, 2013, Mr. Brian Aziz of MVS contacted Mr. Carlson to ask about the status of the DD Form 254 and facility clearance application. *See* AR 19-818 (E-mail from Brian Aziz to Cathy Nelson). He also contacted Ms. Cathy Nelson at GSA. *Id.* She told him that the form was being processed, but it would not be awarded by February 4, and GSA could not provide a specific time for the completion of the clearance award process. AR 54-3287 (E-mail from Cathy Nelson to Brian Aziz). That same day, Mr. Carlson sent a reply to a then-nearly-two-month-old e-mail sent by Ms. Miller to him on December 6, 2012, which included the DD Form 254 she then had "just received from MVS." AR 54-3291 (E-mail from Donald Carlson to Anne Miller). Mr. Carlson apologized for "the delay in getting back to [Ms. Miller] on the DD-254 for MVS" and noted problems with the form MVS had submitted on December 6, 2012. *Id.* He asked Ms. Miller to send another package of documents to him for his final

---

[8]This portion of the opinion has been modified from that filed under seal to reflect the court's grant of MVS's motion to alter or amend the opinion and order. The administrative record as initially filed with the court and as corrected by the government and supplemented upon motions by each of the parties did not disclose the proper sequence of all events. With its motion to alter and amend, MVS provided documents missing from the corrected and supplemented administrative record, and those documents clarify the pertinent sequence. The materials thus provided should have been part of the administrative record from the outset. MVS's motion further to supplement the administrative record with those documents has been granted by the court.

processing with the Defense Security Service ("DSS"), which handles facility security clearance requests. *See id.* Mr. Carlson submitted MVS's DD Form 254 package to DISA for review on February 6 and to DSS for action on February 8, 2013. AR 54-3342 (E-mail from Donald Carlson to Terry Scott); AR 54-3431 (E-mail from Donald Carlson to DSS).

In the meantime, the three offerors submitted their final quotation revisions on February 4, 2013. *See* AR 32-2136 (MVS's Final Quotation Revision). MVS did not present proof of a facility clearance, but it did explain the steps it had taken to attempt to obtain one. *Id.* It also [***] its price from [***] to [***]. *Cf.* AR 43-3145 (MVS's Interim Price Evaluation Report); AR 63-3552 (MVS's Final Price Evaluation Report). The other offerors presented proof of a facility clearance. AR 40-2958 to -60 (Northrop Grumman's Proof of Facility Clearance); AR 34-2511 ([***]'s Proof of Facility Clearance). DISA sent MVS evaluation notices on February 6 and February 12, 2013, requesting that MVS confirm its ability to obtain a facility clearance at the level of secret prior to award. AR 36-2515 to -17 (E-mail from Vanessa McCollum, DISA Contracting Officer, to MVS); AR 39-2534, 2630 to -31 (E-mail from Vanessa McCollum to MVS). MVS responded to both notices and confirmed it would be able to obtain the requisite facility clearance prior to award. *See* AR 30-1679 (MVS's Response to Evaluation Notice); AR 39-2631 (MVS's Second Response to Evaluation Notice). On February 12, 2013, DISA also requested that the three offerors provide a second round of final quotation revisions by February 13, 2013. *See* AR 39-2535 to -36 (Final Quotation Revision Request to MVS); AR 40-2767.1 to -67.2 (Northrop Grumman's Final Quotation Revision). All three offerors submitted these revisions on February 13, 2013. *See* AR 39-2537 (MVS's Second Quotation Revision); AR 40-2767.1 to -67.2 (Northrop Grumman's Second Final Quotation Revision). MVS did not provide proof of a facility clearance, but Northrop Grumman and the third offeror did. *See id.* DISA evaluated the February 13 final quotation revisions, and determined that while MVS had submitted the lowest-priced technically acceptable quote, its quote was unacceptable and ineligible for award because MVS did not possess the requisite facility clearance or an interim facility clearance prior to award. AR 45-3170, 3187 to -88 (Final Evaluation-Selection Recommendation Document). DISA determined that Northrop Grumman submitted the second-lowest technically acceptable price and possessed the requisite facility clearance. *Id.* at 3170, 3189. On March 1, 2013, DISA contacted DSS to inquire about the status of MVS's request for a facility clearance and was told that MVS was "currently in process for a Secret [facility clearance]." AR 38-2533 (E-mail from Alice Kispert, DSS, to Vanessa McCollum); AR 43-3187 to -88 (Final Evaluation-Selection Recommendation Document). The same day, DISA awarded the task order for the procurement at issue to Northrop Grumman. AR 47-3209 (E-mail from Vanessa McCollum to Blanca Hernandez, Northrop Grumman).

DISA then notified MVS that it had submitted the lowest-priced technically acceptable quote, but its offer was not awardable because MVS had not obtained the necessary facility clearance prior to award. AR 48-3211 to -12 (Letter from John Herrmann, Contracting Officer, to MVS (Mar. 1, 2013)). MVS filed an agency protest with DISA on March 11, 2013, AR 49-3213 to -21, which denied the protest on March 19, 2013, AR 51-3223 to -30. MVS filed suit in this court on April 5, 2013. After accelerated submissions of cross-motions and briefs, a hearing was held on June 12, 2013.

## JURISDICTION

This court has jurisdiction over bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104–320, 110 Stat. 3870. The amended statute empowers this court "to render judgment on an action by an interested party objecting to a solicitation by a [f]ederal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).[9] Although they do not challenge the general applicability of Subsection 1491(b), the government and Northrop Grumman dispute MVS's standing to challenge the award of the task order to Northrop Grumman. *See* Def.'s Mot. at 26; Def.-Intervenor's Mot. to Dismiss or, in the Alternative, for Judgment on the Admin. Record ("Def.-Intervenor's Mot.") at 19, ECF No. 47. To establish standing in a bid protest in this court, a petitioner must be an "interested party." 28 U.S.C. § 1491(b)(1). The "interested party" standard is more stringent than the "case or controversy" requirement of Article III of the Constitution. *See Systems Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012) (citing *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009)). It requires MVS to establish that it "(1) is an actual or prospective bidder; and (2) possess[es] the requisite direct economic interest." *Id.* (alteration in original).

The posture of a protest — whether it is initiated before or after an award is made — determines the evidentiary showing necessary to establish a "direct economic interest:"

> Generally, to prove the existence of a direct economic interest, a party must show that it had a "substantial chance" of winning the contract. An exception to that standard is when a prospective bidder challenges the terms of the solicitation itself, prior to actually submitting a bid. In that circumstance, the protestor can establish standing by demonstrating that it suffered a "non-trivial competitive injury which can be redressed by judicial relief."

*Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (internal citations omitted); *see also Weeks Marine*, 575 F.3d at 1361-62. Here, MVS is an actual bidder and submitted a quote in response to the RFQ, so it must establish that it had a substantial chance of receiving the task order. The government argues that MVS cannot establish that it had a substantial chance of receiving the task order because the RFQ "required proof of possession of a facility clearance," which MVS did not possess, and thus it had no chance of receiving the

---

[9]As described *supra*, MVS's protest concerns the award of a task order, and the court generally does not have jurisdiction over awards of task orders. *See* 10 U.S.C. § 2304c(e)(1) ("A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for [enumerated exceptions]."). Nonetheless, this statutory constraint does not apply to the court's jurisdiction over protests of task orders under GSA FSS contracts, such as the Schedule 70 contract underlying this dispute. *See Furniture by Thurston v. United States*, 103 Fed. Cl. 505, 511 n.8 (2012); *see also IDEA Int'l, Inc. v. United States*, 74 Fed. Cl. 129, 135-36 (2006) (explaining that the provisions of 10 U.S.C. § 2304c do not apply to protests relating to the placement of orders under GSA Federal Supply Schedule contracts).

award.  Def.'s Mot. at 30.  This argument bypasses MVS's central contention, which is that GSA and DISA did not act appropriately in processing MVS's request for a facility clearance, in essence denying MVS fair consideration of its offer made in response to the RFQ.  MVS has demonstrated that it submitted the lowest-priced technically acceptable offer and would likely have received the award but for the delay in processing the DD Form 254 it submitted.

In contesting MVS's standing, and thus this court's jurisdiction over MVS's protest, the government relies on *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375 (Fed. Cir. 2009).  *See* Def.'s Mot. at 28-30.  In *Labatt*, the plaintiff filed two bid protests with the Government Accountability Office ("GAO"), and in response, the government took corrective action, issued amendments to the solicitation, and reopened the procurement to accept revised proposals on the issues addressed by amendments.  577 F.3d at 1377-78.  For the final amendment issued, the government specified that responses had to be received by 2:00 p.m. on a particular date.  *Id.* at 1378.  Labatt submitted a response via e-mail more than two hours after the established deadline, and consequently was removed from the procurement competition.  *Id.*  Although all three offerors submitted initial responses using an unauthorized method — e-mail instead of paper — only Labatt was ultimately removed from the competition.  *Id.* at 1379.  The Federal Circuit found that "the government's mistaken acceptance of bid revisions via e-mail [rather than paper] neither helped nor hindered any offeror," *id.* at 1380, and that Labatt's "untimely submission [in response to the amendment] constituted a separate and independently sufficient ground for rejection," such that it did not have a substantial chance of receiving the award, *id.* at 1381.  Labatt's unfortunate circumstance was solely of its own making, and thus the decision is distinguishable on its facts from those of this case.

In this instance, MVS submitted a DD Form 254 package on December 6, 2012, more than two months before final quotations for the RFQ were required to be submitted.  AR 16-774 (E-mail from Tim Bracken to Anne Miller).  The government did not begin work to process that request for a facility clearance until February 1, 2013.  AR 54-3291 (E-mail from Donald Carlson to Anne Miller).  As such, MVS has demonstrated that, but for the government's tardy actions with respect to the facility clearance, it had a substantial chance of receiving the award.  Accordingly, MVS has standing to challenge the government's failure to process MVS's request for a facility clearance in a timely manner, materially affecting the award that was ultimately made.  *See Miles Constr., LLC v. United States*, 108 Fed. Cl. 792, 797-98 (2013) (holding that a service-disabled veteran-owned small business had standing to challenge its disqualification that resulted from agency-level protest proceedings after it had won an award); *Innovation Dev. Enters. of Am., Inc. v. United States*, 108 Fed. Cl. 711, 723-24 (2013) (ruling that a protestor had standing to challenge a sole-source procurement because it had a substantial chance of a contractual award but for the agency's decision to limit competition).  Insofar as standing is concerned, this case has many similarities to *Castle-Rose, Inc. v. United States*, 99 Fed. Cl. 517 (2011), in which a protestor challenged an agency's determination that its proposal was late and would not be considered, and the government asserted that the protestor lacked standing because its proposal was late.  The court in *Castle-Rose* rejected the government's attempt to apply the reasoning of *Labatt*, commenting that the government was "begging the question before the court, in effect saying that Castle-Rose cannot dispute whether its proposal was late, because its proposal was late."  *Castle-Rose*, 99 Fed. Cl. at 523.  The court concluded that "Castle-Rose is disputing the very point upon which the government relies to try to eliminate its standing.

Whether or not the submission was late is a question to be resolved on the merits, and the answer to that question should not be presumed in the defendant's favor to deny a plaintiff the substantive review to which it is entitled." *Id*. (citing *Information Handling Servs., Inc. v. Defense Automated Printing Servs.*, 338 F.3d 1024, 1030 (D.C. Cir. 2003); *Systems Plus, Inc. v. United States*, 69 Fed. Cl. 757, 763-69 (2006); *Client Network Servs., Inc v. United States*, 64 Fed. Cl. 784, 788-89 (2005)).  The same result appertains here.

## STANDARD FOR DECISION

The court reviews a challenge to an agency's award of a contract using the standards set out in the Administrative Procedure Act, 5 U.S.C. § 706.  *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.").  These standards permit the court to set aside an agency's contracting decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), assuming the criteria for equitable relief are satisfied, *see PGBA, LLC v. United States*, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004).  The standards are highly deferential to the agency's decision and do not allow the court to substitute its own judgment for that of the agency.  *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000); *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004).  The court must uphold the agency's decision even if the court itself might have applied the procurement regulations in a different manner had it been in the agency's position.  *Angelica Textile Servs., Inc. v. United States*, 95 Fed. Cl. 208, 218 (2010) (citing *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989)).

An agency's decision may be set aside only "if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'"  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1332).  An agency decision lacks rational basis only if the contracting officer "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Keeton Corrs.*, 59 Fed. Cl. at 755 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotations omitted)).  When a challenge is brought asserting contravention of law, the protestor "must show a clear and prejudicial violation of applicable statutes or regulations."  *Centech Grp., Inc.*, 554 F.3d at 1037 (quoting *Impresa*, 238 F.3d at 1333).

To prevail on either a lack of rational basis or a violation of law, a protestor also must establish a "significant, prejudicial error in the procurement process."  *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999); *see also Bannum*, 404 F.3d at 1351 ("[I]f the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.").  Establishing significant prejudice requires the protestor to show there was a "'substantial chance' it would have received the contract award but for the [agency's] errors."  *Bannum*, 404 F.3d at 1353 (citing *Information Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).  This second showing of prejudice differs from that related to

standing because it affects the relief, if any, that the protestor is entitled to receive. *See USFalcon, Inc. v. United States*, 92 Fed. Cl. 436, 450 (2010); *Systems Plus*, 69 Fed. Cl. at 769.

If a protestor makes these showings, the court "may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2). To determine if a permanent injunction should issue, "the court must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc.*, 554 F.3d at 1037 (citing *PGBA*, 389 F.3d at 1228-29).

## ANALYSIS

### A. *Whether a Clear and Prejudicial Violation of the FAR Occurred*

The crux of MVS's protest is that the government violated Part 8 of the Federal Acquisition Regulations ("FAR"), found at Title 48 of the Code of Federal Regulations, in considering the materials MVS submitted in response to the RFQ for satellite communications services. Specifically, MVS contends that the government violated FAR 8.405-2(c)(3)(iii)(C), which requires the order activity contracting officer to "[e]nsure all quotes received are fairly considered and award is made in accordance with the evaluation criteria in the RFQ."

### 1. *The enforceability of FAR 8.405-2.*

At the outset, the court notes that "a procurement under [S]ubpart 8.4 is different in kind from one conducted under Part 15, even if some procedures also present in Part 15 are u[s]ed." *Holloway & Co., PLLC v. United States*, 87 Fed. Cl. 381, 393 (2009) (quoting *Systems Plus, Inc. v. United States*, 68 Fed. Cl. 206, 211 (2005)) (alteration in original). In short, the rigorous competitive procedures in Part 15 do not necessarily apply. *See id.* The government argues that this distinction means that MVS cannot base its challenge on a clear and prejudicial violation of the FAR, relying on *Ellsworth Assocs., Inc. v. United States*, 45 Fed. Cl. 388 (1999). *See* Def.'s Mot. at 37. The decision in *Ellsworth* states:

> [In a FAR Part 8 procurement,] a frustrated bidder may still challenge the agency award under the arbitrary and capricious standard articulated in 5 U.S.C. § 706(2)(A). However, the protester will not be able to prevail on the theory that the procurement procedure involved a clear and prejudicial violation of applicable statutes and regulations, because no applicable procedural regulations are contained in Part 8. A protester instead must rely on establishing that the government officials involved in the procurement process were without a rational and reasonable basis for their decision.

45 Fed. Cl. at 395-96. In making this argument, however, the government fails to acknowledge that FAR Part 8 has been amended to include procedural requirements in the 14 years since *Ellsworth* was decided. Saliently, FAR 8.405-2(c)(3)(iii)(C), on which MVS relies, was

11

established by Interim Rule, effective May 16, 2011, and as a Final Rule, effective April 2, 2012. *See* 76 Fed. Reg. 14541, 14548 (Mar. 16, 2011) (establishing the interim rule); 77 Fed. Reg. 12912, 12927 (Mar. 2, 2012) (establishing the final rule). Those rules implemented Section 863 of the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009, Pub. L. 110-417, 122 Stat. 4356 (Oct. 14, 2008). "Section 863 mandated the development and publication of regulations in the FAR to enhance competition for the award of orders placed under multiple-award contracts." 76 Fed. Reg. 14548. As such, FAR 8.405-2(c)(3)(iii)(C) is a procedural regulation that this court may enforce and which could provide a basis for a claim that the government engaged in a clear and prejudicial violation of the FAR.

### 2. *The applicability of FAR 8.405-2(c)(3)(iii)(C) to the DISA procurement.*

FAR 8.405-2 sets forth procedures to be followed when an ordering activity seeks to obtain services requiring a statement of work through a Federal Supply Schedule contract. FAR 8.405-2(c)(3)(iii)(C) places an obligation on "[t]he ordering activity contracting officer . . . [to e]nsure all quotes received are fairly considered and award is made in accordance with the evaluation criteria in the RFQ." FAR 8.405-2(c)(3)(iii). The government first contends that MVS's claim cannot fall within the ambit of this regulation because the provision "addresses the ordering activity contracting officer . . . [which] is DISA, not GSA, so that provision applies to DISA." Hr'g Tr. 30:25 to 31:4. According to the FAR, an ordering activity is "an activity that is authorized to place orders, or establish blanket purchase agreements (BPA), against the [GSA's] [m]ultiple [a]ward [s]chedule contracts." FAR 8.401.[10]

At the time the RFQ was issued, DISA was the activity authorized to acquire commercial satellite communications services against Federal Supply Schedule contracts. *See* MOA at 1; AR 10-291 (RFQ). However, this role was established in a unique manner — through an MOA between DISA and GSA which the agencies entered in 2009. Prior to the MOA, both agencies had been "manag[ing] separate contractual vehicles to provide these [commercial satellite communications] services, resulting in an overlap of offerings, providers, and markets." MOA at 2. To "avoid[] duplication of efforts," MOA at 1, DISA and GSA agreed to a formal partnership in which each agency would assume significant responsibilities in the acquisition process, *see, e.g.,* MOA, App. A. The MOA does not specify which agency would assume responsibility for processing facility clearance applications if such clearances were required for a commercial satellite communications services procurement. Nonetheless, as the government has acknowledged, DISA and GSA agreed that GSA would receive and sponsor facility clearance applications for commercial satellite communications services procurements. *See* Hr'g Tr. 81:16-24; Def.'s Mot. at 22; *see also* Pl.'s Reply to Def.'s and Intervening Def.'s Responses to Pl.'s Mot. for Judgment on the Admin. Record ("Pl.'s Reply") at 12, ECF No. 76. GSA sponsored the facility clearance applications via Schedule 70 contracts that it managed, even though the Schedule 70 contracts did not require security clearances as a condition of award. *See* AR 9-261 to -62 (E-mail from Donald Carlson to Karen Stewart); Hr'g Tr. 84:13 to 85:6; *see also* Def.'s Mot. at 22. Security clearances were only required for the award of certain task orders within the commercial satellite communications services procurement program, of which

---

[10]FSS contracts, such as MVS's Schedule 70 contract, are qualifying multiple award schedule contracts for purposes of FAR Part 8, Subpart 8.4. *See* FAR 8.402(a).

the RFQ at issue was one. *See* AR 1-27 (2009 Industry Day PowerPoint Slides); AR 2-75 (2010 Industry Day PowerPoint Slides); AR 12-546 (Amendment 2). As such, the ordering activity for the RFQ, DISA, did not maintain sole responsibility for all aspects of the order placed against the Schedule 70 contract. Rather, the MOA allocated responsibility for security clearance sponsorship and processing, a key facet of the RFQ, to GSA, as DISA's partner in the procurement of satellite communications services. Because of that allocation, and because GSA was in sole control of the processing of vendors' security clearance applications for the RFQ, the court concludes that GSA served as the ordering activity with respect to the security clearance aspects of the procurement.

The court must next inquire whether MVS's quote was "fairly considered" within the meaning of FAR 8.405-2(c)(3)(iii).[11] MVS only questions the government's obligations with respect to the receipt and processing of its request for a secret facility clearance needed to obtain the task order at issue. Whether the government's conduct with respect to that part of the procurement amounted to fair consideration turns on the circumstances surrounding that process. In this instance, GSA held two industry day events in 2009 and 2010 at which it noted that facility clearances might be required for the award of *some* commercial satellite communications task orders. AR 1-27; AR 2-75. The GSA website also provided a similar notice. AR 53-3235 (Screenshot of GSA website). The statements did not specify that completed copies of DD Form 254 were to be transmitted to GSA, which would enter facility security clearances as modifications to Schedule 70 contracts. MVS, which did not become eligible for these task orders until January 2011 when it received its Schedule 70 contract, apparently did not understand that GSA was responsible for processing the DD Form 254. Instead, it twice submitted a DD Form 254 to DISA "as part of bid packages in which the DD254 was required." AR 8-258 (E-mail from Karen Stewart to Anne Miller (Nov. 13, 2012)). In November 2012, only a few days before the RFQ at issue was released, GSA contacted MVS directly to ask whether MVS intended to submit a DD Form 254 to obtain a facility clearance that would appear as a modification to the company's Schedule 70 contract. AR 8-251 (E-mail from Anne Miller to Karen Stewart and Tim Bracken (Nov. 13, 2012)). When MVS expressed confusion in its reply, Mr. Carlson of GSA replied, explaining that the DD Form 254 "that [GSA] award[s] to the Schedule 70 contract is the one you really want to have in the system" and that GSA would act as MVS's sponsor for such a clearance. AR 9-262 (E-mail from Donald Carlson to Karen Stewart). MVS did not immediately apply for a facility clearance. On December 6, 2012, it submitted a completed DD Form 254 to GSA several days after DISA issued Amendment 2 to the RFQ and clarified that vendors would be required to possess a secret facility clearance prior to award of the task order. *See* AR 12-546 (Amendment 2); AR 16-774 (E-mail from Tim Bracken to Anne Miller (Dec. 5, 2012)). MVS's submission to GSA did not make any mention of its need to obtain a facility clearance by a certain deadline, and there is no evidence in the record that Mr. Carlson, the GSA official responsible for processing DD Form 254s for the commercial satellite communications services program, was aware of any exigent circumstances.

The record reflects that Mr. Carlson, who received MVS's DD Form 254 on December 6, 2012, AR 17-777 (E-mail from Anne Miller to Donald Carlson), did not act to process the

---

[11]The parties have not identified any prior decision that interprets this regulation in a comparable context.

13

request until February 1, 2013 — 57 days after he received it, *see* AR 18-782 (E-mail from Donald Carlson to Anne Miller). Action was taken only after MVS called Mr. Carlson on February 1 to inquire about the status of its request. *See* AR 19-818 (E-mail from Brian Aziz to Cathy Nelson). That same day, Mr. Carlson sent an e-mail to Ms. Miller, GSA's contract specialist responsible for MVS's Schedule 70 contract, in which he acknowledged the long period of time which had passed, saying, "[s]orry about the delay in getting back to [you] on the DD-254 for MVS." AR 18-782. He also asked Ms. Miller to return to him the completed contents of a DD-254 package he had allegedly sent to her, including a signed DD Form 254, sponsor letter, and a contract modification award document. *Id.* When Ms. Miller explained that he had never sent such a package, Mr. Carlson replied that he would send a "DD-254 package to DISA for [its] approval," and would send that package to Ms. Miller once approval was given. *Id.* Approval was given on February 7, 2013, *see* AR 54-3341 (E-mail from Donald Carlson to Anne Miller), and the DD Form 254 forms were sent to MVS to review, AR 54-3353 (E-mail from Anne Miller to Brian Aziz). MVS sent the completed forms to GSA that same day, *see* AR 54-3386 (E-mail from Anne Miller to Donald Carlson), and Mr. Carlson sent the forms to DSS for processing on February 8, 2013, AR 54-3431 (E-mail from Donald Carlson to DSS). DSS granted an interim secret facility clearance to MVS on April 8, 2013, Am. Compl., Ex. 10, and a final secret facility clearance to MVS on April 29, 2013, Am. Compl., Ex. 11, too late for MVS to receive the task order award.

The record reflects a long period of inaction between December 6, 2012, and February 1, 2013, on the part of GSA. During that time, MVS did not contact GSA to inquire about its application for a facility security clearance until it received a letter from DISA requesting a final quotation revision and proof of facility clearance. *See* AR 32-1788 to -89 (Request for Final Quotation Revision). MVS represents that its inactivity was reasonable, because it contends that the evaluation notices sent by DISA in late December made no mention that MVS's submission with respect to a facility clearance was deficient. *See* Hr'g Tr. 72:2-18. It claims that it acted promptly to resolve the matter after receiving notice from DISA that proof of a security clearance would be needed in February. *See* Hr'g Tr. 72:18-22. The court concurs that MVS's actions are understandable in light of the circumstances. MVS did not hinder the facility clearance application process in any manner.

Regarding GSA's actions, Mr. Carlson provides an explanation for his delay in processing MVS's facility clearance request. He notes that between December 6, 2012, and February 1, 2013, he worked "on the development of [six] DD-254 packages, including MVS's, as well as . . . numerous others that were in various stages of development or modification award processing." Decl. of Donald V. Carlson ("Carlson Decl.") ¶ 14 (May 10, 2013), ECF No. 44. He states that he also worked on a security audit report and was on personal leave for sixteen days during that time period. *Id.* Mr. Carlson additionally says he halted the processing of DD Form 254 requests for a two-week period in January while DSS "was questioning whether a bona fide need existed for any facility clearances under SINs 132-54 and 132-55 under Schedule 70." *Id.* ¶ 15. He resumed processing requests after that issue was resolved and "worked on all the vendors['] requests for facility clearances and did not expedite the request of any particular vendor." *Id.* ¶ 16. Mr. Carlson, however, notes that he did expedite the processing of MVS's request as soon as he was informed that the matter required prompt consideration. *Id.* ¶ 17.

14

Under these circumstances, the court cannot say that MVS's quote and attendant request for a facility security clearance did not receive fair consideration as required by FAR 8.405-2(c)(3)(iii). While Mr. Carlson certainly did not act with alacrity, vigor, or timeliness, he provided a propinquent level of bureaucratic service and consideration. He did not actively ignore any indications that MVS's request was urgent, and he provided MVS with appropriate action once he became aware of the exigency. In sum, MVS has not demonstrated that the government, acting through GSA or DISA, has committed a violation of FAR 8.405-2(c)(3)(iii).

## B. *MVS's Misrepresentation Claims*

MVS also contends that Northrop Grumman made material misrepresentations in its proposal, such that this court should disqualify Northrop Grumman from participation in the procurement at issue.[12] The court need not examine the validity of this contention, as the discussion *supra* has established that MVS does not have the requisite interest to bring such a challenge to the procurement. To bring a material misrepresentation claim, MVS must be an "interested party," *i.e.* an actual or prospective bidder that had a "substantial chance" of winning the task order award. *See Orion Tech., Inc.*, 704 F.3d at 1348; *Weeks Marine*, 575 F.3d at 1361-62. At the time of award, MVS did not meet one of the conditions of the RFQ — that it possess a secret-level facility clearance. This shortcoming was not the result of any violation of a statute or regulation on the part of the government. Accordingly, MVS did not meet one of the conditions for award of the task order, and it cannot bring a challenge to the procurement based upon a claim of material misrepresentation by Northrop Grumman.[13]

---

[12]At the time final quotation revisions were submitted, Northrop Grumman did not have a firm agreement with an essential satellite provider, Thuraya, for use of satellite channels. Northrop Grumman had [***] about the possibility of using certain satellite channels needed to provide communications services in the Middle East to the government under the task order. *See* Hr'g Tr. 115:15 to 116:11; AR 40-2791 to -93 (Northrop Grumman's Final Quotation Revision (Feb. 13, 2013)). MVS and Northrop Grumman submitted numerous declarations addressing the relationship between the aforementioned entities. MVS submitted the declarations of Tim Harrington, a senior contracts manager for ViaSat, Inc., Jassem Nasser, Vice President for Strategy and Business Development of Thuraya Telecommunications Company, Zahid Zaheer, Director of GMPCS Affairs in Thuraya Telecommunications Company, and Robert Demers, Vice President of Government Services of Thuraya Telecommunications Company. *See* Pl.'s Mot. to Complete and Supplement the Admin. Record (May 24, 2013), ECF No. 58. Northrop Grumman submitted declarations from Michael Carew, Vice President of Indirect Sales for Segovia, Inc., d.b.a. Inmarsat Government, Edward Joannides, Program Manager, SATCOM Services, Northrop Grumman, and Daniel Verwiel, Director of Northrop Grumman's Tactical Mission Command Operating Unit. *See* Intervening-Def.'s Mot. to Supplement the Admin. Record (May 10, 2013), ECF No. 48. In light of the court's disposition of the case, the court deems it unnecessary to decide whether these declarations should be admitted to the administrative record.

[13]The parties submitted a number of declarations addressing the factors the court must consider in determining whether to grant a motion for injunctive relief. MVS submitted the

## CONCLUSION

For the reasons stated, the plaintiff's motion for judgment on the administrative record is DENIED.  The government's motion to dismiss or, in the alternative, motion for judgment on the administrative record and the defendant-intervenor's motion to dismiss or, in the alternative, motion for judgment on the administrative record are GRANTED IN PART and DENIED IN PART.  MVS has standing to challenge GSA's actions in handling MVS's request for a facility security clearance, but, on the evidence of record, that challenge is unavailing.

The clerk is directed to issue a final judgment in accord with this disposition.

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge

---

declarations of Deborah Deffaa, MVS's Chief Executive Officer, Brian Aziz, MVS's Director of Government Services, Phillip Berry, Vice President and General Manager of the Command and Control/Situational Awareness business area for ViaSat, Inc., and Tim Harrington, a senior contracts manager for ViaSat, Inc.  *See* Pl.'s Mot. to Complete and Supplement the Admin. Record (May 24, 2013), ECF No. 58; Pl.'s Second Mot. to Supplement the Admin. Record (June 7, 2013), ECF No. 75.  The government submitted the declarations of Sandra Lindecamp, Chief of the Acquisition Branch, PEO C3T, PM JBC-P, Business Management Division, Department of the Army, Celestine Lennox, Procuring Contracting Officer at the Army Contracting Command Aberdeen Proving Ground, and Vanessa McCollum, the DISA/DITCO contracting officer who dealt with the RFQ at issue.  *See* Def.'s Notice of Filing of Affidavit Under Seal, (May 2, 2013), ECF No. 33; Def.'s Second Mot. to Supplement the Admin. Record (May 31, 2013), ECF No. 68.  Northrop Grumman submitted the declaration of Edward Joannides, Program Manager, SATCOM Services, Northrop Grumman.  *See* Intervening-Def.'s Mot. to Supplement the Admin. Record (May 10, 2013), ECF No. 48.  Factual matters pertaining to relief are distinct from factual matters directed toward an agency's award decision.  "'It is the responsibility of this [c]ourt, not the administrative agency [conducting the procurement], to provide for factual proceedings directed toward, and to find facts relevant to, irreparability of harms or prejudice to any party or to the public interest through grant or denial of injunctive [or declaratory] relief.'"  *Holloway & Co.*, 87 Fed. Cl. at 391 n.12 (quoting *PGBA*, 60 Fed. Cl. at 568 n.1); *see also AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 366-67 (2009) ("In general, it is appropriate to add evidence pertaining to . . . the factors governing injunctive relief to the record in a bid protest — not as a supplement to the [administrative record], but as part of this [c]ourt's record.").  Accordingly, the court will admit to the record of the case the portions of these declarations which address injunctive relief.